UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
-----------------------------------------------------X
JEREMY SKEEN,

                Plaintiff,

v.                                           Case No. 1:23-cv-00220 (LEK/PJE)

CITY OF TROY, et al.,

                Defendants.
-----------------------------------------------------X

## PLAINTIFF JEREMY SKEEN'S REPLY MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS AND IN FURTHER SUPPORT OF HIS CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT

### PRELIMINARY STATEMENT

    Plaintiff Jeremy Skeen submits the instant Reply Memorandum in further support of his motion for partial summary judgment and in partial opposition to defendants' motion to dismiss.

    Defendants' opposition confirms the core point of Plaintiff's cross-motion: the City Defendants arrested and prosecuted Jeremy Skeen but failed to provide critical evidence to the prosecutor, treated justification as "not our job," omitted critical self-defense facts from their reports and evidence production, and now defend those choices with *post hoc* arguments built on ambiguous video and selective excerpts from a custodial interview to the exclusion of the other video interview evidence. The Defendants deprived Mr. Skeen of a fair trial, lacked probable cause for his arrest, and are not entitled to qualified immunity.

    Defendants attempt to overcome Plaintiff's fair-trial and malicious-prosecution claims by reframing a suppression/fabrication theory as a non-cognizable "omission" claim, and implying the prosecutor was "on notice" about the Michel recording through paperwork, so any failure to disclose is prosecutorial fault. Defendants are wrong on both counts.

1

First, deprivation of fair trial through omission is a cognizable claim. Omission of evidence infringes upon the right to a fair trial and is often called a *civil Brady claim*. "Information may be 'false' [for the purposes of the right to a fair trial analysis] if material omissions render an otherwise true statement false." *Morse v. Fusto*, 804 F.3d 538, 548 (2d Cir. 2015); *id.* at 547 (holding that "government officials may be held liable for fabricating evidence through false statements or omissions that are both material and made knowingly"); see also *Ashley v. City of New York*, 992 F.3d 128, 139 (2d Cir. 2021) (same).

Second, Law enforcement officers may not deliberately disregard facts known to them that would establish justification. *Jocks v. Tavernier*, 316 F.3d at 135. Even though officers are not obligated to investigate every assertion of innocence, they are prohibited from ignoring clearly exculpatory evidence or applying an incorrect legal standard. See *id.*; *Washington v. Napolitano*, 29 F.4th 93, 103–04 (2d Cir. 2022) (holding that officers must not disregard plainly exculpatory evidence or selectively rely on inculpatory information while neglecting evidence that could materially weaken probable cause); *Kerman v. City of New York*, 261 F.3d 229, 241–42 (2d Cir. 2001) (establishing that officers may not overlook facts that tend to exculpate the suspect during probable-cause assessments).

Next, the Defendants' notice argument fails. The prosecutor confirmed that the Michel interview recording was not available to her before the first grand jury presentment. That indictment was dismissed due to the Michel interview video not being produced during discovery. Notably, the second grand jury returned a no true bill after Defendant Comitale testified as to material inconsistencies between Michel's video interview statement and Michel's grand jury testimony regarding whether McClenos was unarmed. (Pl. SMF ¶¶ 118–131). Lastly, this matter begins and ends with what Defendants cannot refute: on-scene, contemporaneous,

corroborated evidence of justification—including Skeen's immediate explanation ("He came after me"), multiple statements that McClenos attacked Skeen with a knife, and the recovery of a folding knife with the blade extended near McClenos. (Defs. SMF ¶¶ 17, 23–26, 29–30). Defendants' papers do not dispute that these facts were known to police at the time; instead, they argue self-defense was not "clear" and therefore arguable probable cause existed. But *Jocks v. Tavernier*, 316 F.3d 128, 136 (2d Cir. 2003), and its progeny do not permit an officer to "deliberately disregard facts known to him which establish justification," ignoring exculpatory evidence and then retroactively calling the resulting arrest "reasonable."

The Court should deny Defendant's motion and grant Plaintiff's cross-motion for summary judgment on his Fair Trial, Malicious Prosecution and Unlawful Arrest Claims. The opposition does not create a genuine issue of material fact—it largely confirms Plaintiff's showing.

## POINT I

### DEFENDANTS' FAIR-TRIAL OPPOSITION MISSTATES THE LAW AND IGNORES THE RECORD OF SUPPRESSION AND MISLEADING CHARGING NARRATIVES

Defendants' fair-trial argument relies on two propositions: (1) Plaintiff's "omission-based" theory is not cognizable; and (2) a "charging instrument is not evidence," so it cannot support a fair-trial claim. Both are wrong in context and contrary to the record.

**A. The Second Circuit recognizes fair-trial claims where officers create or forward false/misleading evidence likely to influence a jury—and probable cause is not a defense**

Defendants concede (by citing it) the correct elements: creating false information, forwarding it to prosecutors, and a likelihood of influencing a jury's decision. That doctrine

3

comes from cases like *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123 (2d Cir. 1997), *Zahrey v. Coffey*, 221 F.3d 342 (2d Cir. 2000), and *Garnett v. Undercover Officer C0039*, 838 F.3d 265 (2d Cir. 2016). Here, police forwarded a misleading, incomplete and omissive evidentiary narrative to prosecutors and withheld key recorded evidence, causing deprivation of liberty through indictment, bail/conditions, and continued prosecution.

Defendants' also failed to provide the prosecution with powerful impeachment evidence concerning Andre McClenos that was known to both TPD and the Troy Housing Authority. This evidence included McClenos's prior participation in a violent armed home-invasion robbery on THA property; his resulting permanent ban from all THA properties; the existence of a prior Order of Protection requiring him to stay away from Destiny McCarty's residence;  the domestic violence history between McClenos and McCarty that included  threats and harassment toward both McCarty and the Plaintiff in the week preceding March 3, 2020 and the known gang affiliation of McClenos. The Troy Police Department was aware of these facts through prior joint investigations, incident reports, and enforcement actions, yet the record supports that this information—directly bearing on McCarty's credibility, McClenos's motive and aggression, and the context of the confrontation—was not timely (or in some circumstances ever) disclosed to the prosecutor. (Pl. SMF ¶¶ 125-27)

And Defendants' suggestion that probable cause negates the fair-trial claim is foreclosed: *Garnett* holds probable cause is not a defense to a fair-trial fabrication claim. *Garnett*, 838 F.3d at 277.

> **B. The record supports suppression and misleading forwarding of evidence: the Michel recording was not in the prosecutor's hands pre–first grand jury, and critical knife/self-defense facts were omitted from the police-to-prosecutor narrative**

On suppression: The prosecutor did not receive the Michel recording prior to the first grand jury indictment; it was not produced at readiness; it was later demanded; and it was

eventually produced only after that dispute. The second grand jury later heard testimony from Defendant Comitale, that Ms. Michel's video interview had deviated from her grand jury testimony. They returned no true bill. (Pl. SMF ¶¶ 118–131).

On misleading forwarding: Detective Feeley did not recall telling the ADA that Mr. Skeen asserted self-defense or that McClenos wielded a knife, and Feeley chose not to reference McClenos's knife in the statement notice. (Pl. SMF ¶¶ 97–98). Detective Feeley did not include McClenos's knife in his investigative report. (Pl. SMF ¶ 106). Those omissions go to the heart of the case: fair trial as well as justification.

Defendants attempt to wave this away as non-actionable "omissions." But an officer's deliberate choice to transmit a materially misleading narrative—especially where it effectively converts a justified act into a felony—falls within the false information doctrine. It is well settled that material omissions or misrepresentations by officers that mislead a magistrate or prosecutor defeat probable cause. *Golino v. City of New Haven*, 950 F.2d 864 (2d Cir. 1991). It is also plain that officers may be liable for creating misleading summaries or narratives that distort the evidentiary picture and cause prosecution. *Morse v. Fusto*, 804 F.3d 538 (2d Cir. 2015).

### C. Defendants' "the prosecutor had paperwork suggesting a recording existed" argument does not defeat causation or intent

Defendants have suggested elsewhere that police paperwork could have put the prosecutor "on notice" that a recorded interview existed. Even if that were true, it is not a defense. Police are the gatekeepers of recorded evidence; the constitutional obligation is not satisfied by leaving the prosecution to discover the key missing exculpatory recording through inference from their discovery dump. Moreover, the record shows the prosecutor did not have the recording pre–first grand jury and that the case materially changed once the recording was finally obtained, played, and the contents known. (Pl. SMF ¶¶ 118–1).

5

The TPD failed to alert the ADA that Michel's testimony in her interview changed concerning the location of the McClenos knife. This same testimony was what changed between the first and second grand jury presentment. The failure to share this information with the ADA prior to the first presentment is an additional claim of deprivation of fair trial for which the Court should grant summary judgment. There is no material dispute of fact that the defendants did not alert the ADA to the inconsistent Michel testimony. It was clearly material to the first grand jury's decision to return an indictment, while the second grand jury heard the same Michel testimony, but was then told of the inconsistency by Comitale, and returned no true bill.

## POINT II

**DEFENDANTS' OPPOSITION DOES NOT DEFEAT (AND IN FACT REINFORCES) PLAINTIFF'S MALICIOUS PROSECUTION CLAIM AND REQUEST FOR PARTIAL SUMMARY JUDGMENT**

To defeat malicious prosecution, Defendants must show probable cause to prosecute (or at least arguable probable cause for qualified immunity). Their briefing recycles the same flawed logic: justification was not "clear," therefore probable cause persisted. The record defeats that argument for three independent reasons.

### A. Probable cause to prosecute was undermined from the start by known justification evidence and omitted exculpatory facts

For the same reasons explained above, officers had—and documented—justification evidence. (Defs. SMF ¶¶ 17, 23–26, 29–30). Yet the lead detectives omitted reference to McClenos's possession of a knife and the facts supporting the Plaintiff's claims of self-defense from the statement notice shared with the prosecutor. (Gifford Decl., Exh. G, Dkt 100-10, Comitale Dep. 227:7–15; Pl. SMF ¶¶ 97–98, 106). That conduct supports a claim for malicious

6

prosecution because it is evidence of creation and continuation of a prosecution without proper grounds, not merely "leaving the decision to the DA." Further, the next-day video interview of McCarty stating that McClenos had an open knife throughout his encounter with the Plaintiff (Comitale Decl., Exh. C) was an intervening material fact.

The Defendants also failed to disclose to the prosecutor significant impeaching evidence regarding McClenos's extensive history of domestic violence, gang involvement, firearm possession, and narcotics sales, which she would have viewed as material and producible in discovery to the Plaintiff. (Pl. SMF 127, 129).

### B. The first indictment presumption of probable cause is rebutted by suppression /misleading evidence—confirmed by the later dismissal and no-true-bill

Defendants attempt to sidestep the indictment presumption issue, but the record makes it unavoidable. The assigned ADA testified that neither she nor defense counsel possessed Michel's recorded interview before the first grand jury. (Gifford Decl., Ex A, Dkt. 100-4, Botts Dep. 45:12–46:14). She testified that the recording was not turned over until July 8, 2021. (Gifford Decl., Ex A, Dkt. 100-4, Botts Dep. 50:9). She testified she still had not received it even when the People announced readiness for trial. (Gifford Decl., Ex A, Dkt. 100-4, Botts Dep. 50:14). She testified that even as she became ready for trial, neither Feeley nor Comitale told her the recording existed. (Gifford Decl., Ex A, Dkt. 100-4, Botts Dep. 51:13–52:9). After the recording was finally obtained, the case dynamics changed: at the second grand jury, Comitale testified regarding Michel's inconsistent statements, and the grand jury returned no true bill. (Pl. SMF ¶¶ 130-31).

This was not a discovery dispute. It was material suppression and omission that rebuts any presumption that the first indictment reflected untainted probable cause. See *Savino v. City of New York*, 331 F.3d 63, 72 (2d Cir. 2003) (presumption rebuttable by fraud, perjury,

7

suppression of evidence, or other bad faith conduct); *Manganiello v. City of New York*, 612 F.3d 149, 162 (2d Cir. 2010) (same).

### C. Defendants cannot rely on "no intervening facts" cases where the intervening fact is police suppression/misleading conduct

Defendants cite general propositions that probable cause continues absent intervening facts, yet they ignore the obvious "intervening fact" present. Here, the "intervening fact" was McCarty's police interview one day after Mr. Skeen's arrest. In that interview, also recorded, McCarty (identified by the police as the individual with the absolute best angle on the incident (Pl. SMF ¶ 154)) explained that McClenos was the aggressor and that she saw the knife from the first moment she stepped outside and that McClenos held the knife in his hand throughout the entirety of his exchange with the Plaintiff. (Gifford Decl, Exh. F, Dkt. 100-9, Feeley Dep. 148:5–149:7; 153:3; 153:15–21). The Defense pretends McCarty's interview does not exist and seeks to ignore the obvious "intervening fact" that undermines the prior finding of probable cause.

### POINT III

**DEFENDANTS'** ***JOCKS*** **ARGUMENT FAILS: WHEN POLICE KNOW JUSTIFICATION IS SUPPORTED BY THE EVIDENCE, IT NEGATES PROBABLE CAUSE**

Justification is an exculpatory defense, and "defenses which negate the existence of a crime should similarly negate probable cause." *Jocks v. Tavernier*, 316 F.3d 128, 135 (2d Cir. 2003) (citing *People v. Valles*, 62 N.Y.2d 36 (1984)). Defendants attempt to avoid application of the rule by arguing justification was not "clear," so arguable probable cause existed. The problem is the record: Defendants' own Rule 56.1 submissions and witnesses establish that officers possessed—and in multiple instances documented—evidence supporting justification before arrest and charging.

**A. The justification evidence was not speculative; it was immediate, repeated, and corroborated by physical evidence**

The justification account began at the scene, not in hindsight. Skeen immediately admitted the stabbing and simultaneously explained it as defensive: "It was me, Officer. He came after me." (Defs. SMF ¶ 17). Additional officer narratives captured the same point—that McClenos came at Skeen with a knife and Skeen acted in self-defense. (Defs. SMF ¶¶ 23–26).

Corroboration defeats Defendants' "unclear defense" story: a folding knife with the blade extended was found near McClenos and collected as evidence. (Defs. SMF ¶ 30).

Defendants' opposition tries to create doubt by emphasizing a *pocketknife was closed at certain moments* during Skeen's interview. But the existence of the open-bladed knife near McClenos is not a Plaintiff "spin"—it is Defendants' own SMF. (Defs. SMF ¶ 30). And Detective Comitale conceded the knife blade was open. (Pl. SMF ¶ 107). Moreover, McCarty confirmed at approximately 7:34-36 of her video statement—which had been delayed by Feeley until the morning following the incident—that the knife blade was out and in McClenos' possession. (Comitale Decl., Exh C). Notably, Detectives Comitale and Feeley texted near the time of their depositions to confer as to whether the knife blade had been out. (Comitale, 9:16-11:12).

Defendants cannot escape *Jocks* by re-labeling this as a credibility dispute. Police had multiple contemporaneous statements and physical evidence supporting the exculpatory defense. *Jocks* holds that where police know of the existence and validity of justification, it negates probable cause. 316 F.3d at 135.

**B. Defendants' "video solves it" theory is wrong: the surveillance is too distant to identify key details**

Defendants invoke the surveillance video as if it conclusively disproves self-defense. It does not. The video reflects that the incident is too far from the camera for important details to

be observable, including McClenos holding the knife. (Comitale Decl., Exh. B). Plainly inconclusive video evidence does not transform officers' failure to credit corroborated justification evidence into "arguable probable cause." Defendants' reliance upon it is misplaced.

### C. Defendants' attempt to manufacture "arguable probable cause" collapses because the arrest decision was driven by a legally erroneous approach to justification-- and Defendants' own witnesses admitted it

Defendants argue in substance that, even if justification existed, it was not "clear," so a reasonable officer could arrest anyway. That is not what happened. The record shows that the lead detectives did not evaluate justification as part of the probable-cause assessment at all—they treated it as a charging-phase issue.

Detective Comitale testified self-defense was not something he considered as part of the investigation; he believed it was for the "charging phase," and "[i]t is not our job to give him a self-defense claim." (Pl. SMF ¶¶ 93–94). He admitted he was aware both Skeen and McCarty made statements consistent with self-defense but did not incorporate them into the statement notice used for charging. (Pl. SMF ¶ 96). He did not recall informing the ADA that Skeen asserted self-defense or that McClenos wielded a knife, and he made a conscious decision not to reference McClenos's knife in the statement notice shared with the prosecutor. (Pl. SMF ¶¶ 97–98). Defendants, in rejecting justification, wrongly believed that, "What this came down to was a decision to leave the house with a knife in your hand" (Gifford Decl., Exh. G, Comitale Dep. 156:16) and when "there was that distance between them, you leave the situation, close the door, lock it." (Gifford Decl., Exh. G, Comitale Dep. 159).

Detective Feeley likewise testified in ways that are irreconcilable with Defendants' narrative that they carefully considered Article 35. Feeley believed that because Skeen left the home with a knife rather than remain inside, justification/self-defense could not be valid. (Pl.

SMF ¶ 104). Feeley did not include the fact that McClenos possessed a knife in his investigative report. (Pl. SMF ¶ 106).

These admissions matter, as qualified immunity turns on whether "a reasonable officer" could believe probable cause existed "in the light of well-established law." *Zellner v. Summerlin*, 494 F.3d 344, 369 (2d Cir. 2007). A reasonable officer—aware of *Jocks*' rule that known justification negates probable cause—cannot (a) refuse to evaluate justification, (b) omit the knife from charging materials, and (c) then claim arguable probable cause because the defense was "unclear."

### D. The timing reinforces the constitutional failure: Defendants charged first and interviewed the key eyewitness later

Defendants' opposition relies heavily on what Skeen said in an interview and what the video supposedly "shows." But Defendants charged Skeen at 10:54 p.m. on March 3, 2020, and did not interview eyewitness Destiny McCarty until 11 hours later. (Pl. Resp. to Defs. SMF ¶ 37), at which time she confirmed (Comitale Decl., Exh. C) that McClenos had an open knife in his hands throughout his interaction with the Plaintiff. That sequencing alone undercuts any claim that the arrest decision was a careful, reasonable, justification-aware probable-cause determination.

### POINT IV

**DEFENDANTS' <u>MONELL</u> OPPOSITION DOES NOT ENTITLE THE CITY TO SUMMARY JUDGMENT, AND THE RECORD SUPPORTS PLAINTIFF'S REQUEST FOR PARTIAL SUMMARY JUDGMENT ON DISCRETE MUNICIPAL PREDICATES**

Defendants argue Plaintiff's *Monell* theory is overbroad and not tied to policy or training failures. That is inaccurate. Plaintiff's cross-motion, at pp. 24-34, sets forth specific *Monell* claims that the record establishes and that align directly with the constitutional injuries here,

particularly: (1) failure to train on domestic-violence response and the related section of the TPD General Orders, (2) failure to supervise on escalation safeguards involving domestic-violence response; (3) failure to train on civilian justification under Penal Law Article 35 and its relevance to probable cause; (4) a policy of evidence handling respecting the legal standards required for appropriate police chain of custody; (5) a policy of evidence disclosure procedures that fails to ensure prosecutors actually receive material witness recordings and other exculpatory evidence; and (6) a policy of staffing specialized detective functions through a seniority bid system untethered to training or competency.

Regarding the Plaintiff's first and second *Monell* claims, failure to train on domestic violence response and relevant TPD General Orders across the Troy Police Department, Defendants uniformly testified that they did not recall receiving, reviewing, or being reinforced on domestic-violence–specific training or TPD General Order 8.15 beyond their initial academy instruction.

To this point, Keeler testified that he was unaware of any documented roll-call training on General Order 8.15 (Bondy Decl., Ex A, Keeler Dep. 67:5-8; 67:9), did not recall the 2016 online domestic violence training (Bondy Decl., Ex A, Keeler Dep. 68:10; 68:12), and could not recall ever seeing a counseling memorandum involving domestic violence or General Order 8.15 during his nineteen years with the Department (Bondy Decl., Ex A, Keeler Dep. 77:15-18; 77:19). Wheeler could not identify any training required of, or provided to, supervisory personnel upon the creation of the domestic violence unit (Bondy Decl., Exh J, Wheeler Dep. 54:14-16; 54:18-22). Cipperly could not recall when he last reviewed General Order 8.15 (Cipperly Dep. 48:9-11; 48:12-13), how such reviews were tracked prior to Lexipol (49:11-13;

49:14), or whether he had received training addressing the difficulty domestic violence victims may have in identifying abuse (116:4-7; 116:8-9).

Comitale testified that he could not recall any domestic-violence–specific training during his career with the Troy Police Department ( Gifford Decl., Exh. G, Dkt 100-10, Comitale Dep. 135:13-136:2), nor did he recall reviewing Section 8.15 during the Skeen investigation (Gifford Decl., Exh. G, Dkt 100-10, Comitale Dep. 137:5-9). Feeley could not recall the amount or substance of domestic violence training received in 1995 (Gifford Decl., Exh. F, Dkt. 100-9, Feeley Dep. 46:8-15) and testified that he did not recall receiving any domestic violence training beyond the Air Force Academy and the Zone 5 Police Academy (Gifford Decl., Exh. F, Dkt. 100-9, Feeley Dep. 46:16-21). McKenna could not identify when, how often, or where domestic violence classes occurred (Gifford Decl., Exh. H, Dkt 100-11, McKenna Dep. 37:15-20), nor could he locate the primary aggressor analysis within the General Orders (44:19-23).

Milano repeatedly testified that he could not recall receiving domestic violence training, its content, duration, or materials, either at the Albany County Sheriff's Office or the Troy Police Department (Gifford Decl., Exh. M, Dkt 100-16, Milano Dep. 39:21-25; 47:14-48:4). Montanino similarly could not recall the timing or substance of any refresher training on domestic violence (Gifford Decl., Exh. L, Dkt 100-15, Montanino Dep. 254:11-13). Finally, Snyder testified that, based on his training, he did not know whether a lethality assessment should have been completed (Gifford Decl., Exh. K, Dkt 100-14, Snyder Dep. 182:22-25), nor whether a primary aggressor analysis should have been conducted (Gifford Decl., Exh. K, Dkt 100-14, Snyder Dep. 185:5-12).

As to the Plaintiff's third *Monell* claim, the record evidence is that the City's relevant training on legal standards centered on *Graham v. Connor*, 490 U.S. 386 (1989)—a police use-

13

of-force case—not on civilian self-defense/justification principles that governed this arrest and prosecution. (Pl. SMF ¶ 111). Consistent with that deficiency, officers applied an incorrect legal framework to Skeen's arrest. They believed—erroneously—that Skeen's failure to remain inside the apartment and close the door violated a supposed "reasonable expectation to retreat," and that this earlier conduct negated any later justification. (Pl. SMF ¶¶ 99–100). Detective Feeley similarly concluded that Skeen's act of leaving the apartment with a knife categorically defeated any claim of justification or self-defense, and testified that he was unaware Skeen was even asserting self-defense until this litigation. (Pl. SMF ¶¶ 101–104).

This is precisely the scenario contemplated by *Walker*: the City knows to a moral certainty that officers will confront violent incidents requiring probable-cause determinations where justification is central; those determinations involve difficult legal choices; and erroneous training predictably results in wrongful arrests and prosecutions. *Walker*, 974 F.2d at 297–99.

The detectives who exercised charging influence/authority testified in ways that plainly demonstrated misunderstanding or non-application of justification doctrine: Comitale treated self-defense as "not our job," and Feeley believed leaving the house with a knife invalidated self-defense. (Pl. SMF ¶¶ 93–94, 99–100, 104). Under *City of Canton v. Harris*, 489 U.S. 378 (1989), and its progeny, a municipality is liable where failure to train reflects deliberate indifference and causes constitutional injury. Where—exactly as here—officers repeatedly confront domestic-violence escalation and must decide whether an admitted use of force is criminal or justified, the need for training on justification is obvious.

As to the Plaintiff's fourth and fifth *Monell* claims, the City's Rule 30(b)(6) witness admitted that Troy permits detectives to create and circulate "working copies" of evidence outside the formal evidence-locker system pursuant only to informal past practice, with no

14

written policy and no training governing that practice. (Bondy Decl., Ex. A, Keeler Dep. 141:17–142:9). Courts have held that unreliable evidence-handling practices, which cause important exculpatory or impeachment evidence to reach prosecutors late, may violate due process and create municipal liability. See *Russo v. City of Bridgeport*, 479 F.3d 196 (2d Cir. 2007); *Kyles v. Whitley*, 514 U.S. 419, 437–38 (1995). When a municipality acknowledges that its policies or training regarding the handling of critical evidence are deficient in fundamental safeguards, a jury may determine that there was deliberate indifference under *Monell*. *See Walker v. City of New York*, 974 F.2d 293, 297–99 (2d Cir. 1992).

The clear lack of policy was made worse by the uncontested fact that TPD officers were not given any formal or practical training on how to recognize, preserve, or share exculpatory (Brady) evidence. (Bondy Decl., Ex. A, Keeler Dep. 181:10; 182:18). Plaintiff's expert explains that constitutionally adequate training requires a curriculum with learning objectives, instruction, assessment, and recordkeeping—all of which the record shows were absent here. (Bondy Decl., Ex. B, del Pozo Report; Pl. SMF ¶¶ 32–33).

The consequences were concrete. The prosecutor testified that neither she nor defense counsel had Crystal Michel's recorded interview before the first grand jury, that it should have been provided, and that even when the People announced ready for trial she still had not received it. (Pl. SMF ¶¶ 117–124). Defendants' own evidence confirms that the original recording was never checked out of the TPD evidence locker from the time it was logged on March 4, 2020, until it was accessed during this civil litigation. Defendants claim a "working copy" was provided to the District Attorney's Office, but offer no competent proof that any TPD employee delivered such a copy or that any prosecutor received it; the City's 30(b)(6) witness conceded the

City cannot identify anyone who allegedly delivered the recording and admitted there is no policy or training governing this practice. (Bondy Decl., Ex. A, Keeler Dep. 141:17–142:9).

Critically, the Assistant District Attorney testified that Detectives Feeley and Comitale failed to inform her that the Michel recording existed, impairing her ability to present the case to the grand jury. (Pl. SMF ¶¶ 122–123, 125–126). Judge Young dismissed the indictment, holding that the failure to present Michel's police interview—and the contradictions it contained—impaired the integrity of the grand jury. (Gifford Decl., Ex. E, Dkt. 100-8; Pl. SMF ¶¶ 138–140). When the second grand jury later heard testimony addressing those contradictions, the charge did not survive. (Pl. SMF ¶¶ 130–131).

Defendants' attempt to reframe these failures as prosecutorial oversight has only underscored the City's practice of placing the burden on prosecutors to discover missing, logged evidence rather than maintaining documented procedures to ensure timely transmission. (Pl. SMF ¶¶ 10–12, 22, 114, 117–126, 138–140). This is not the "rare" single-incident theory rejected in *Connick*, but an obvious and recurring need for training and procedures in routine police evidence handling, where the predictable consequence of failure is the resulting impaired grand-jury integrity and wrongful deprivation of liberty. See *Connick v. Thompson*, 563 U.S. 51, 63–64 (2011); *Walker*, 974 F.2d at 297–99.

As to the Plaintiff's sixth *Monell* claim, Plaintiff has adduced evidence of an admitted, Citywide staffing policy under which detective assignments—including domestic-violence detective roles—are filled strictly by seniority rather than qualifications, with no mandatory training upon assignment. (Pl. SMF ¶¶ 72–74, 141–143). Plaintiff's expert opines that this practice is inconsistent with modern policing standards for specialized investigative roles and predictably undermines investigative quality and supervision. (Pl. SMF ¶¶ 144–146; see also Pl.

SMF ¶ 159). These facts independently support *Monell* liability under two theories: (1) an affirmative policy permitting specialized detective positions to be filled by officers lacking the necessary skills, and (2) a failure to train detectives assigned to those roles.

The record supports *Monell* causation through a tight, non-speculative fit between the City's admitted municipal failures and the constitutional injuries at issue. Non-domestic violence detectives were assigned to domestic violence related investigations. The Detectives assigned treated civilian justification as outside their investigative role, applied an incorrect retreat framework, and omitted justification-related facts from their investigative reports—conduct a jury could reasonably find was a predictable product of the City's failure to train on Article 35 civilian justification and its policy of staffing detective roles without mandatory detective training. (Pl. SMF ¶¶ 5, 13, 18, 31, 93–104, 141–143). The same deficiencies support Plaintiff's fair-trial and grand-jury claims: the prosecutor did not have, and was not told of, a recorded witness interview containing material impeachment before the first grand jury; the omission impaired the proceeding; and when Comitale's testimony regarding Michel's inconsistent statements was presented, the grand jury declined to indict—facts from which a jury could conclude that the City's lack of training and procedures for identifying, preserving, and transmitting exculpatory and impeachment evidence was a moving force behind Plaintiff's deprivation of liberty. (Pl. SMF ¶¶ 10–12, 22, 117–126, 130–131, 138–140).

Finally, Plaintiff adduces evidence that TPD lacked meaningful domestic-violence training, failed to train on its own DV General Order, and treated core DV safeguards as inapplicable even in a paradigmatic DV context—facts a jury could find were a moving force behind the Department's failure to identify escalation risk and apply DV safeguards in the hours preceding the fatal confrontation. (Pl. SMF ¶¶ 2–4, 6–9, 24–25, 61–68, 69–75). This is not

merely a bad outcome, but record evidence of Department-level decisions and omissions that made constitutional violations highly predictable and plausibly causal. *City of Canton v. Harris*, 489 U.S. 378, 390 (1989); *Walker v. City of New York*, 974 F.2d 293, 297–99 (2d Cir. 1992).

Accordingly, Defendants are not entitled to summary judgment on *Monell*, and Plaintiff's cross-motion should be granted at least as to those elements established by undisputed evidence and defense admissions—including the absence of Article 35 and domestic-violence training, the lack of procedures governing exculpatory evidence, and the seniority-based detective staffing policy—thereby narrowing the issues for trial. (Pl. SMF ¶¶ 2–5, 6–13, 22, 24–25, 72–74, 141–143).

Remarkably, Defendants' own deposition testimony reflects their entrenched, continuing institutional hubris: a collective belief that nothing was done wrong then and that nothing would be done differently today. For example, the City of Troy testified through 30(b)(6) witness Wheeler that there was nothing the Troy Police Department could have done differently to avoid Mr. McClenos's death and that the Department did nothing wrong. (Bondy Decl., Exh J, Wheeler Dep. 276:23 – 277:14). Comitale likewise could not identify a single action that he or the Department should have handled differently. (Gifford Decl., Exh. G, Dkt 100-10, Comitale Dep. 245:21–25; 246:2). McKenna testified that even if he had known of a prior incident at the same location, McClenos's involvement in a violent robbery, or his ban from the housing complex—individually or cumulatively—none of that would have altered his decisions. (Gifford Decl., Exh. H, Dkt. 100-11, McKenna Dep. 180:9–22; 181:2–18). And Snyder similarly testified that he "wouldn't change anything" and that the Department "handled it appropriately," even when confronted with facts bearing directly on escalation risk and supervisory intervention. (Gifford Decl., Exh. K, Dkt 100-14, Snyder Dep. 193:7–13; 203:22–25; 204:3–4). A jury could

reasonably view these admissions as powerful evidence of deliberate indifference—confirming not only past failures, but an ongoing municipal posture resistant to reflection, correction, or reform.

As such, these issues present triable *Monell* questions; on the present cross-motion record, Plaintiff has shown sufficient undisputed predicate facts to warrant partial summary judgment narrowing municipal issues for trial, as Defendants' own testimony confirms that their failures were not aberrational or the product of hindsight, but reflect an institutional posture that persists to this day.

## **CONCLUSION**

For the foregoing reasons, Plaintiff respectfully requests that the Court:

1.  Deny Defendants' motion for summary judgment in its entirety;

2.  Grant Plaintiff's cross-motion for partial summary judgment on the discrete issues identified in Plaintiff's moving papers (false arrest/false imprisonment; malicious prosecution; denial of fair trial; and Monell predicates), or, at minimum, grant partial summary judgment as to the absence of probable cause where Defendants knew justification was supported by the evidence; and

3.  Grant such other and further relief as the Court deems just and proper.

Dated: February 5, 2026
       New York, New York

Respectfully submitted,
_____/S/_____
Joseph A. Bondy


_____/S/_____
Wylie M. Stecklow
*Attorneys for Plaintiff Jeremy Skeen*