UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

JEREMY SKEEN,

                        Plaintiff,

-against-                                      1:23-CV-00220 (LEK/PJE)

CITY OF TROY, *et al.*,

                        Defendants.

## MEMORANDUM-DECISION AND ORDER

### I.      INTRODUCTION

On February 19, 2023, Plaintiff Jeremy Skeen commenced this action by filing a complaint asserting claims under 42 U.S.C. § 1983, the New York State Constitution, Article I §12, and various New York state laws regarding deprivation of a fair trial and malicious prosecution, *see* Dkt. No. 1 ("Complaint"). The Complaint names as defendants the City of Troy, the Troy Police Department, the Troy Housing Authority, Detective Sergeant Thomas J. Feeley, Detective Joshua M. Comitale, Troy Housing Authority Patrolman Michael Gordon, Troy Police Patrolman Jeremy Snyder, John Doe Troy Police Officers, and John Doe Troy Housing Officers. *Id.* at 1. Plaintiff later agreed to discontinue the action with prejudice against the Troy Housing Authority, and Troy Housing Authority Patrolman Gordon, in the latter's capacity as an employee of the Troy Housing Authority. Dkt. No. 55 ("Troy Housing Stipulation"); Dkt. No. 58 ("Troy Housing Dismissal").

On February 13, 2024, Plaintiff filed an amended complaint. Dkt. No. 57 ("Amended Complaint"). The Amended Complaint adds as defendants Troy Police Sergeant Peter Montanino, Troy Police Patrolman McKenna, Troy Police Patrolman Justin Byrnes, and Troy

Police Patrolman Philip Milano. *Id* at 1. Defendants filed answers to the Amended Complaint. *See* Dkt. Nos. 67–75 ("Answers"). On December 1, 2025, Defendants filed a Motion for Summary Judgment. Dkt. No. 100 ("Def. MSJ"). On December 30, 2025, Plaintiff responded to Defendants' Motion and filed his own Cross-Motion for Partial Summary Judgment. Dkt. No. 102 ("Plaintiff Response").[1] Defendants filed a reply in support of their Motion and a response to Plaintiff's Cross-Motion. Dkt. No. 103. ("Def. Reply"). Plaintiff filed a reply in support of his Cross-Motion. Dkt. No. 106 ("Plaintiff Reply"). Subsequently, the parties stipulated the dismissal of Defendants Milano, Snyder, Byrnes, and McKenna. Dkt. No. 107 ("Officer Stipulation"); Dkt. No. 108 ("Officer Dismissal"). Subsequent to those dismissals, Defendants Feeley, Comitale, Gordon, Montanino, and the City of Troy remain as Defendants.

For the reasons stated below, the Court grants Defendants' Motion for Summary Judgment.

## II.    BACKGROUND

The factual summary of the relevant events is taken from the parties' statement of material facts and the attached exhibits. Disputes of material fact in the record are noted.

This case originates from the tragic death of Mr. Andre McClenos ("the Decedent") on March 3, 2020 at the hands of Plaintiff, and the police response to the events prior to and after that death.

The Decedent and Plaintiff's girlfriend, Ms. Destiny McCarty, had two children together. Dkt. No 102-3 at 10 ("del Pozo Report"). Ms. McCarty and the Decedent had a history of

---

[1] Defendants filed an initial Motion for Partial Summary Judgement, followed by a corrected Motion. *See* Dkts. No. 101 ("Initial Plaintiff Response"), 102. The Court treats the corrected Motion, Dkt. No. 102, as the operative document.

domestic violence incidents prior to the night of the Decedent's death. *See* Dkt. No. 102-12 ¶¶ 50–55 ("Pl. SMF") .

On March 3, 2020, the Decedent came to Ms. McCarty's home and "was kicking the door and yelling." *Id.* at 24. When told to leave, the Decedent "started threatening her and the children." *Id.* After Ms. McCarty called the police, at 7:48 P.M., the Decedent left the scene and was not arrested. *Id.*; Dkt. No. 10-1 ¶ 14 ("Def. SMF"). While police were present, the Decedent called Ms. McCarty, and yelled at her. Dkt. No. 100-14 ¶¶ 78–80 ("Snyder Dep.").

At 9:10 P.M., the Decedent returned to Ms. McCarty's home in a car driven by Ms. Crystal Michel. Dkt. No. 100-Ex. B to Comitale Dec. at 9:10:29–9:10:40 ("Home Video")[2]; *see* Dkt. No. 100-Ex. C to Comitale Dec. at 00:07:00–00:07:10 ("Michel Interview"). The accounts of Ms. Michel, Plaintiff, and Ms. McCarty differ, so this Court focuses on what is contained in the surveillance video that captured the visuals of the scene, without audio. *See generally*, Home Video. The Decedent knocked on the door to the home and then retreated to his car. *See id.* at 9:10:40–9:11:25. Ms. McCarty then walked out toward the Decedent as Plaintiff stood in the doorway. *See id.* at 9:14:06–9:14:10. Both Ms. McCarty and Plaintiff observed that the Decedent had a knife. *See* Dkt. No. 100-Ex. A to Comitale Dec. at 00:05:49–00:06:05 ("Skeen Interview"); Dkt. No. 100-Ex. D to Comitale Dec. at 00:06:40–00:06:45, 00:07:30–00:07:53 ("McCarty Interview"). Plaintiff walked out of the house, holding a knife he retrieved from the kitchen. *See* Home Video at 9:14:38– 9:14:41; Skeen Interview at 00:06:55–00:07:00. Ms. McCarty moved toward the car, as she wanted to ask Ms. Michel why she had brought the Decedent to her house. *See* Home Video 9:14:49–9:14:53; McCarty Interview at 00:07:02–00:07:15. She did not reach

---

[2] Ex. A, B, C, D & G to the Comitale Dec. and Ex. N & O to the Gifford Dec. have been filed under seal.

Ms. Michel. *See* Home Video at 9:14:53–9:14:59. Rather, the Decedent grabbed Ms. McCarty by the hair. *See* Home Video at 9:14:57–9:14:59; McCarty Interview at 00:08:13–00:08:19. Plaintiff then moved toward the Decedent, suggesting that they put their knives down. *See* Home Video at 9:15:00–9:15:21; Skeen Interview at 00:06:55–00:07:99. The Decedent stepped back to his car, appearing to retrieve something. *Id.* at 9:15:21–9:15:33. The two men walked toward each other. *See id.* at 9:16:00–9:16:08. Ms. Michel claimed that Plaintiff made the first move, Michel Interview at 00:08:51–00:08:53;00:19:25–00:19:40, while Plaintiff claimed that the Decedent "swung at [him] first," requiring that Plaintiff respond in self-defense, Skeen Interview at 00:08:52–00:09:39. Plaintiff stabbed the decedent. *See* Home Video at 9:16:08–9:16:20. The Decedent then retreated into the car, and Ms. McCarty and Ms. Michel tried to help him. *See* Home Video at 9:16:20–9:16:53; McCarty Interview at 00:13:20–00:13:45.

Ms. Michel called the police. Defendant Gordon was the first to respond and provided first aid to the Decedent. Plaintiff told Defendant Gordon, "It was me, Officer. He came after me." Def. SMF ¶ 17. He also told Defendant Byrnes, "I did it, I stabbed him. I had to he swung at me with the knife." *Id.* ¶ 25. Officers found a kitchen knife and a "small pocketknife with its blade out" on the scene. *Id.* ¶¶ 29–30.

Officers interviewed Plaintiff after reading him his Miranda rights. *Id.* ¶¶ 31–34. Officers also interviewed Ms. Michel and Ms. McCarty. *Id.* ¶¶ 38, 40, 41. Police arrested Plaintiff for manslaughter in the first degree, assault in the first degree with use of a deadly instrument, and criminal possession of a weapon in the fourth degree. *Id.* ¶ 39. The charging papers show the arrest as being made on March 4, 2020, at 12:30 A.M. *See id.* ¶ 39; *see also* Dkt. No. 102-13 ¶ 39 ("Pl. Resp. to Def. SMF") (admitting that the papers show as such, but claiming Plaintiff had been functionally arrested earlier).

4

"On March 4, 2020 . . . Feeley emailed . . . Rensselaer County Assistant District Attorneys Matt Hauff and Cheryl McDermott an Investigative Reporting Form." Def. SMF ¶ 42; Dkt. No. 100-30 at 2 ("Feeley Follow Up"). The Form references a recorded interview with Ms. Michel. *See* Feeley Follow Up at 2. However, Plaintiff argues, with supporting testimony from ADA McDermott (now Botts), that the District Attorney's Office did not receive the Michel interview at that time, or even at the point that the DA had declared trial readiness. Pl. SMF ¶¶ 115–20. Defendants dispute this. *See* Dkt. No. 103-1 ¶¶ 115–20 ("Def. Resp. to Pl. SMF").

On March 6, 2020, the Rensselaer County District Attorney impaneled a Grand Jury, which returned an indictment of Plaintiff. Def. SMF ¶¶ 43, 54. On September 10, 2021, the Rensselaer County Court dismissed the charges against Plaintiff due to the prosecution's failure to provide Defense with the video of Ms. Michel's interview. Dkt. No. 100-8 at 2, 4 ("Rensselaer County Court"). The Rensselaer County Court expressly permitted the District Attorney to present the charges to a second grand jury. *Id.* at 4. The District Attorney's Office then sought to bring charges against Plaintiff again, but was unsuccessful. *See* Pl. SMF ¶130.

## III.    LEGAL STANDARD

Rule 56 of the Federal Rules of Civil Procedure instruct courts to grant summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law," and a dispute is "'genuine' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving part." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Thus, while "[f]actual disputes that are irrelevant or unnecessary" will not preclude summary judgment, granting summary judgment is improper if there are genuinely disputed material facts. *Id.*; *see also Taggart v. Time, Inc.*, 924 F.2d 43, 46

(2d Cir. 1991) ("Only when no reasonable trier of facts could find in favor of the nonmoving party should summary judgment be granted.").

The party seeking summary judgment bears the burden of informing a court of the basis for the motion and identifying those portions of the record that the moving party claims will demonstrate the absence of a genuine dispute of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). In attempting to defeat a motion for summary judgment after the moving party has met its initial burden, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

The nonmoving party may not rely on "mere conclusory allegations, speculation, or conjecture," *see Fischer v. Forrest*, 968 F.3d 216, 221 (2d Cir. 2020) (quoting *Cifarelli v. Village of Babylon*, 93 F.3d 47, 51 (2d Cir. 1996)), and must present more than a mere "scintilla of evidence" supporting its claims. *Anderson*, 477 U.S. at 252. At the same time, a court must resolve all ambiguities and "draw all reasonable inferences in favor of the nonmoving party," *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000), and "eschew credibility assessments," *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 122 (2d Cir. 2004) (quoting *Weyant v. Okst*, 101 F.3d 845, 854 (2d Cir. 1996)). Thus, a Court's duty in reviewing a motion for summary judgment is "carefully limited" to "finding genuine disputes of fact," "not to deciding them." *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994).

IV.    DISCUSSION

A. False Arrest

Defendants move for summary judgment on Plaintiff's false arrest claim. Def. MSJ at 8–10. In the alternative, they argue that qualified immunity applies. *Id.* at 18–19. Plaintiff also moves for summary judgment on this claim. Resp. at 10–14.

"In analyzing § 1983 claims for unconstitutional false arrest, [courts] have generally looked to the law of the state in which the arrest occurred." *Jaegly v. Couch*, 439 F.3d 149, 151 (2d Cir. 2006) (quoting *Davis v. Rodriguez*, 364 F.3d, 424, 433 (2d Cir. 2004)). "Under New York law, the elements of a false arrest and false imprisonment claim are: '(1) the defendant intended to confine the plaintiff, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement and (4) the confinement was not otherwise privileged.'" *Hernandez v. United States*, 939 F.3d 191, 199 (2d Cir. 2019) (quoting *McGowan v. United States*, 825 F.3d 118, 126 (2d Cir. 2016) (per curiam)).

"The existence of probable cause to arrest constitutes justification and 'is a complete defense to an action for false arrest.'" *Weyant*, 101 F.3d at 852 (quoting *Bernard v. United States*, 25 F.3d 98, 102 (2d Cir. 1994)). "[P]robable cause to arrest exists when the officers have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." *Id.* To determine whether probable cause is present, "a court considers only the facts 'available to the officer at the time of the arrest and immediately before it.'" *Ashley v. City of New York*, 992 F.3d 128, 136 (2d Cir. 2021) (quoting *Stansbury v. Wertman*, 721 F.3d 84, 89 (2d Cir. 2013)).

7

An arresting officer need not "investigate exculpatory defenses offered by the person being arrested or . . . assess the credibility of unverified claims of justification before making an arrest." *Jocks v. Tavernier*, 316 F.3d 128, 135–36 (2d Cir. 2003). However, an arresting officer may not "deliberately disregard facts known to him which establish justification," as justification would vitiate probable cause. *Id.* at 136.

Plaintiff killed the Decedent. The question is whether "a person of reasonable caution" would have believed that Plaintiff's actions were criminal, or, in the alternative, that they were justified. Under New York law,

> A person may not use deadly physical force upon another person . . . unless [t]he actor reasonably believes that such other person is using or about to use deadly physical force. Even in such case, however, the actor may not use deadly physical force if he . . . knows that with complete personal safety, to oneself and others he or she may avoid the necessity of so doing by retreating; except that the actor is under no duty to retreat if he . . . is in his dwelling and not the initial aggressor.

N.Y. Penal Law §35.15(2). As the New York Court of Appeals has held, the individuals' "duty to retreat . . . [does] not arise until the point at which deadly physical force was used or imminent." *Matter of Y.K.*, 663 N.E.2d 313, 313 (N.Y. 1996). For example, in *Matter of Y.K.*, the New York Court of Appeals found that a teenage girl who was being harassed by a group of teens used force justifiably when she stabbed an attacker who was on top of her, even though the girl could have retreated to a subway station earlier in the encounter. *Id.* at 314–15.

Plaintiff argues that at the moment force was used, Plaintiff could not have "retreat[ed] in complete safety." Pl. Resp. at 12. Therefore, Plaintiff concludes, his use of deadly force was justified, and probable cause did not exist. *Id.*

Defendants were confronted with conflicting pieces of evidence regarding the immediate lead-up to the stabbing. *See e.g.,* Michel Interview; McCarty Interview; Skeen Interview; Home

8

Video. When interviewed by police, Ms. Michel recalled that "Andre [McClenos] didn't even swing" and that the Plaintiff was the aggressor in the final moments of the encounter. Michel Interview at 00:08:51–00:08:53. In her police interview, Ms. McCarty recounts hearing Plaintiff tell the Decedent to put the knife down, but did not see what happened when the Decedent was stabbed. McCarty Interview at 00:11:20–00:11:23; 00:11:33–00:11:54. In Plaintiff's account, by contrast, the Decedent "swung at [him] first," and the Decedent "lunged forward toward [him] with the knife." Skeen Interview at 00:08:52–00:09:46. Plaintiff's account suggests that he had little to no time to retreat. Two knives were recovered at the scene, with the Decedent's knife blade out; police knew that the Decedent was armed. *See* Def. SMF ¶ 30.

Video footage can be used to sort through conflicting testimony and other pieces of evidence. *See Cornelius v. Luna*, No. 24-1859-CV, 2025 WL 2753713, at *3 (2d Cir. Sept. 29, 2025) ("[T]here are cases where the video evidence is so conclusive that summary judgment is warranted, even in the face of other contradictory evidence and testimony offered by a party.") Critically, as Plaintiff acknowledges, the surveillance footage captures events "too far from the camera for important details to be observable," and the footage is "[p]lainly inconclusive." Pl. Reply at 9–10. This Court, in reviewing the admittedly grainy footage, does not observe evidence in the video to support justification. Prior to the stabbing, Plaintiff walked closer to the Decedent, who was standing still. *See* Home Video at 9:16:00–9:16:03. This suggests there may have been a moment at which Plaintiff could have retreated. *Id.* Even in the final moments before the stabbing, Plaintiff appears to have stepped toward the Decedent, and the Decedent then made a full move toward Plaintiff, who responded. *See* Home Video at 9:16:08–9:16:10. Additionally, the Court's review of the footage suggests that approximately twenty seconds prior to the stabbing, there was a moment for Plaintiff to retreat, when Decedent was near the car, and

Plaintiff and Ms. McCarty appear to be about five feet or so from the door of the home. *See* Home Video at 9:15:52.

The video does not disprove that Plaintiff was acting in self-defense. However, it failed to support the self-defense justification, in a context in which no eyewitness other than Plaintiff himself observed the Decedent attack first in the final moments. *See* McCarty Interview at 00:11:33–00:11:54; Skeen Interview at 00:08:52–00:09:39; Michel Interview at 00:08:51–00:08:53. As police officers need not "assess the credibility of unverified claims of justification before making an arrest," *Jocks,* 316 F.3d at 136, this Court finds that there was probable cause to arrest Plaintiff. Defendants are entitled to summary judgment on this claim.

B. **Malicious Prosecution**

"In order to prevail on a § 1983 claim against a state actor for malicious prosecution, a plaintiff must show a violation of his rights under the Fourth Amendment, and must establish the elements of a malicious prosecution claim under state law." *Manganiello v. City of New York*, 612 F.3d 149, 161 (2d Cir. 2010) (internal citations omitted). In the State of New York, a plaintiff bringing a malicious prosecution claim must show "(1) the initiation or continuation of a criminal proceeding against plaintiff; (2) termination of the proceeding in plaintiff's favor; (3) lack of probable cause for commencing the proceeding; and (4) actual malice as a motivation for defendant's actions." *Id.* (quoting *Murphy v. Lynn*, 118 F.3d 938, 947 (2d Cir. 1997), *cert. denied*, 522 U.S. 1115 (1998)). As probable cause is a complete defense for a malicious prosecution claim, and Defendants had probable cause to arrest Plaintiff, *see* Part IV(A), the Court grants Defendants summary judgment on this claim.

### C. Right to a Fair Trial

"A fair trial claim is a civil claim for violations of a criminal defendant's Fourteenth Amendment due process rights." *Fappiano v. City of New York*, 640 F. App'x 115, 118 (2d Cir. 2016). "A defendant's right to a fair trial is violated when exculpatory evidence is withheld, i.e., when a *Brady* violation occurs, and also when an officer forwards fabricated evidence to prosecutors." *Ying Li v. City of New York*, 246 F. Supp. 3d 578, 626 (E.D.N.Y. 2017) (internal citations omitted). Plaintiff presents both fair-trial violation theories. Pl. Resp at 18.[3] Following the parties' briefing, the Court discusses the fabrication of evidence claim first, followed by the *Brady* claim.

#### 1. Fabrication of Evidence

"To succeed on a fabricated-evidence claim, a plaintiff must establish that 'an (1) investigating official (2) fabricate[d] information (3) that is likely to influence a jury's verdict, (4) forward[ed] that information to prosecutors, and (5) the plaintiff suffer[red] a deprivation of life, liberty, or property as a result.'" *Ashley* , 992 F.3d at 139. "Information may be 'false' if material omissions render an otherwise true statement false." *Morse v. Fusto*, 804 F.3d 538, 548 (2d Cir. 2015). "[I]n the context of a fabrication of evidence claim, the Second Circuit equates 'the fraudulent omission of factual information . . . with the affirmative perpetration of a falsehood,' and expressly disclaims any 'plausible legal distinction between misstatements and omissions.'" *Hutchins v. Solomon*, No. 16-CV-10029 (KMK), 2018 WL 4757970, at *17 (S.D.N.Y. Sept. 29, 2018) (quoting *Morse*, 804 F.3d at 550)).

---

[3] In his Reply, Plaintiff presents a third fair-trial theory, claiming that Defendants had not provided information to the District Attorney's office regarding the Decedent's criminal history. Pl. Reply at 4. As "new arguments may not be made in a reply brief," this Court will not consider this third theory. *Ernst Haas Studio, Inc. v. Palm Press, Inc.*, 164 F.3d 110, 112 (2d Cir. 1999).

First, Plaintiff notes that "Detective Comitale chose not to reference McClenos's knife in the statement notice used for charging and did not recall telling the ADA that Skeen asserted self-defense or that McClenos wielded a knife. Detective Feeley did not include McClenos's knife in his investigative report." Pl. Resp. at 18 (internal citations omitted). Defendants argue, by contrast, that other documents provided to the District Attorney's office contained information regarding Plaintiff's self-defense claim and the Decedent's possession of the knife. Def. Reply at 11–12. Specifically, Defendants note that Officer Snyder's Incident Report, the admission documented by Officer McKenna, and Plaintiff's police interview mention that Plaintiff claimed the Decedent was in possession of a knife. *See* Def. Reply at 11; Dkt. No. 100-45 ("Snyder Incident Report"); Dkt. No 100-38 ("McKenna Admission Form"); Skeen Interview at 00:05:49–00:06:05.

The Court observes that there is an important distinction between the fact that Plaintiff *claimed* that the Decedent had a knife, and the fact that the Decedent had a knife. Therefore, it was vital that the discovery of a second knife on the scene be known to prosecutors; this occurred. *See* Feeley Follow Up at 2. On March 4, 2020, Officer Feeley sent ADA McDermott a "follow up," which contained the fact that officers "noticed a small pocket style knife on the ground just outside the passenger side door" of Ms. Michel's car. *See id.* at 2. Therefore, the prosecution was aware of the Decedent's knife. The omission of this information from other documents cannot be said to be material, as it would not "affect a prosecutor's assessment of the strength of a case, a prosecutor's decision to pursue charges, or a jury's verdict." *Harasz v. Katz*, 327 F. Supp. 3d 418, 435 (D. Conn. 2018). Prosecutors had access to the relevant information; Plaintiff's first theory is not availing.

*2. Brady Violation*

"A fair trial claim may also arise where the police or prosecutors withhold material exculpatory or impeaching evidence from a defendant. The latter theory of liability is essentially a civil claim seeking damages for a *Brady* violation." *Fappiano v. City of New York*, 640 F. App'x 115, 118 (2d Cir. 2016). "There are three components of a . . . *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281–82 (1999); *see also Brady v. Maryland*, 373 U.S. 83 (1963). "Impeachment evidence is evidence 'having the potential to alter the jury's assessment of the credibility of a significant prosecution witness.'" *United States v. Rivas*, 377 F.3d 195, 199 (2d Cir. 2004) (quoting *United States v. Avellino*, 136 F.3d 249, 255 (2d Cir. 1998)). "When police officers withhold exculpatory or impeaching evidence from prosecutors, they may be held liable under § 1983 for violating the disclosure requirements of *Brady.*" *Bellamy v. City of New York*, 914 F.3d 727, 751 (2d Cir. 2019) "To establish prejudice, a plaintiff must show materiality." *Poventud v. City of New York*, 750 F.3d 121, 133 (2d Cir. 2014). "[The] touchstone of materiality is a reasonable probability of a different result." *Leka v. Portuondo*, 257 F.3d 89, 104 (2d Cir. 2001) (quoting *Kyles v. Whitley*, 514 U.S. 419, 434 (1995)).

Plaintiff argues that the Michel interview "was not possessed by the ADA (and not produced to defense counsel) before the first grand jury—and that the lead detectives did not tell the ADA it existed even as the People announced readiness for trial." Pl. Resp. at 18–19. Defendants counter that "the ADA undeniably received the investigative report dated March 4, 2020 . . . which explicitly informed her of the existence of Ms. Michel's interview." Def. Resp.

13

at 10. As Defendants explain, "The fact that the ADA failed to review the evidence and to request a copy of the video evidence she claimed that she did not have, is not akin to withholding evidence." Def. Resp. at 10. The email referred to by Defendants states, "[Investigating Officer] and Det Comitale also spoke with Michel who gave her version of events. (see recorded interview)." Feeley Follow Up at 2. The "see recorded interview" line put prosecutors on notice of the existence of a recorded interview, which, if they did not have access to it at that moment, they might reasonably expect to gain access, since the police were instructing them to view it. Nonetheless, Defendants do not claim to have provided the recording to the ADA. *See e.g.,* Def. Resp. to Pl. SMF ¶117.

Defendants do not respond to Plaintiff's *Brady* argument. *See* Def. Reply at 11–12 (responding only to the fabrication of evidence claim). Defendants merely state that they "never failed to report or document the information he claims was intentionally withheld." Mot. at 15. "[W]hen a non-movant fails to oppose a legal argument asserted by a movant, the movant may succeed on the argument by showing that the argument possess[es] facial merit, which has appropriately been characterized as a 'modest' burden." *Rehkugler v. Aetna Life Ins. Co.*, No. 516CV0024GTSATB, 2017 WL 3016835, at *13 (N.D.N.Y. July 14, 2017). "Cross-motions for summary judgment are evaluated in the same manner as individual motions for summary judgment. Each motion is considered independently of each other; when evaluating each, the court considers facts in the light most favorable to the non-moving party." *Hippe v. Life Ins. Co. of N. Am.*, No. 02-CV-0086 (ILG), 2003 WL 22220749, at *5 (E.D.N.Y. July 31, 2003) (internal citations omitted) (citing *Morales v. Quintel Entertainment, Inc.*, 249 F.3d 115, 121 (2d Cir. 2001)). As Defendants have presented no legal argument responding to Plaintiff's claim on

Cross-Motion that Plaintiff is entitled to summary judgment regarding the Michel video, Plaintiff need only show that his argument has "facial merit." *See Rehkugler*, 2017 WL 3016835, at *13.

Nonetheless, Plaintiff's argument is not facially meritorious, because Defendants are entitled to qualified immunity.

Defendants argue that they are entitled to qualified immunity on the fair trial claim, as it was "objectively reasonable for the Defendants [to] believe that their acts did not violate clearly established rights." Mot. at 19 (citing *Townes v. City of New York*, 176 F.3d 138, 143 (2d Cir. 1999)). Qualified immunity "protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (internal quotations omitted) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "To determine whether a defendant is entitled to qualified immunity, courts ask whether the facts shown 'make out a violation of a constitutional right' and 'whether the right at issue was "clearly established" at the time of defendant's alleged misconduct.'" *Estate of Devine*, 676 F. App'x 61, 62 (2d Cir. 2017) (summary order) (quoting *Pearson*, 555 U.S. at 232). The Court first determines whether a right has been violated before performing its "clearly established" analysis. *Genovese v. Scrheiner*, No. 3:19-CV-950 (OAW), 2023 WL 6442834, at *15 (D. Conn. Oct. 2, 2023).

"To be clearly established, a right must be sufficiently clear that every reasonable official would [have understood] that what he is doing violates that right." *Brown v. City of New York*, 862 F.3d 182, 190 (2d Cir. 2017) (quoting *Reichle v. Howards*, 566 U.S. 658 (2012)). "Because '[i]t is sometimes difficult for an officer to determine how the relevant legal doctrine . . . will apply' in a particular factual situation, 'clearly established law must be particularized to the facts

15

of the case.'" *Horn v. Stephenson*, 11 F.4th 163, 169 (2d Cir. 2021) (quoting *Sloley v. VanBramer*, 945 F.3d 30, 40 (2d Cir. 2019); *White v. Pauly*, 580 U.S. 73, 79 (2017)).  As the Supreme Court has explained,

> To be clearly established, a legal principle must have a sufficiently clear foundation in then-existing precedent. The rule must be settled law, which means it is dictated by controlling authority or a robust consensus of cases of persuasive authority. It is not enough that the rule is suggested by then-existing precedent. The precedent must be clear enough that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply.

*D.C. v. Wesby*, 583 U.S. 48, 63 (2018) (cleaned up). Courts are "not to define clearly established law at a high level of generality." *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011)).

The first and third *Brady* elements are met in this case. It is not disputed that the video was impeachment evidence, *see* Def. Resp. to Pl. SMF ¶ 124, thus satisfying the first element. For the third element, Plaintiff was prejudiced by the police's failure to provide the video to the prosecution.

As the Rensselaer County Court found,

> By failing to present the evidence as detailed in the video statement, the People have violated their duty of fair dealing to defendant and candor to the Court. It should also be noted that the testimony elicited from the witness was, to say the least, brief. Here, it cannot be said that the integrity of the grand jury was not impaired as it can be inferred that the People were aware of this evidence and failed to present it. As such, the Court cannot conclude that there was not at the very least the potential for prejudice to defendant in this case insofar as the grand jurors were unable to make an accurate assessment of the totality of the circumstances under the particular and unique facts of this case, notwithstanding the sufficiency of the evidence.

Rensselaer County Court at 4. This Court finds the Rensselaer County Court's reasoning persuasive.

16

This case therefore turns on the second *Brady* element obtains, that is, whether the Michel Interview was "suppressed by the State." *See Strickler v. Greene*, 527 U.S. 263, 281–82 (1999). Here, the police informed the prosecution of the existence of an impeachment video but did not provide the video, and the prosecution did not ask for the video. *See* Def. Resp. at 10. This is not a typical *Brady* case involving police officers who mislead prosecutors or completely "withhold exculpatory evidence from prosectors." *See Galloway v. Cnty. of Nassau*, 141 F.4th 417, 425 (2d Cir. 2025). Rather, both police and prosecutors here made errors—the police, in not turning over the recording, and the prosecution, in not asking for it. Only the officers, and not the prosecution, are before this Court as Defendants.

This Court finds that Defendants failed to uphold their obligations under *Brady*. "As the Second Circuit held nearly three decades ago, 'the police satisfy their obligations under *Brady* when they turn exculpatory evidence over to the prosecutors.'" *Newson v. City of New York*, No. 16CV6773ILGJO, 2019 WL 3997466, at *9 (E.D.N.Y. Aug. 23, 2019) (quoting *Walker v. City of New York*, 974 F.2d 293, 299 (2d Cir. 1992)). "Thereafter, it is the responsibility of the prosecutors, not the police, to ensure that *Brady* material is disclosed to the defense." *Id.* However, the prosecutors' obligation in turn to deliver the evidence to the defense was not triggered in this case, because the police may have failed to "turn [impeachment] evidence over to the prosecutors." *Id.* Plaintiffs have thus made a facially meritorious argument with respect to the underlying constitutional violation in their *Brady* claim.

However, qualified immunity defeats Plaintiff's claim. Plaintiff has not provided the Court with *any* cases showing liability where the police notify the prosecution of evidence but do not deliver it to the prosecution, let alone a sufficient body of law that would make liability "clearly established law." *See* Pl. Resp. at 18–20. Nor has the Court found any such cases from

17

this Circuit, in its own research. Therefore, this Court grants Defendants qualified immunity on the *Brady* fair trial claim.

### D.  Malicious Abuse of Process

Defendants move for summary judgment on Plaintiff's malicious abuse of process claim. Mot at. 15–16. Plaintiff opposed finding summary judgment on this issue. Pl. Resp. at 20–21. Plaintiff's malicious abuse of process claim rests on the theory that Defendants tried to cover up their earlier failure to protect Ms. McCarty and Plaintiff. *Id.*

"In New York, 'a malicious abuse-of-process claim lies against a defendant who (1) employs regularly issued legal process to compel performance or forbearance of some act (2) with intent to do harm without excuse of justification, and (3) in order to obtain a collateral objective that is outside the legitimate ends of the process.'" *Savino v. City of New York*, 331 F.3d 63, 76 (2d Cir. 2003) (quoting *Cook v. Sheldon*, 41 F.3d 73, 80 (2d Cir. 1994)). "There has been considerable confusion within [the Second] Circuit regarding whether probable cause is a complete defense to a claim of abuse of process under New York law." *Mangino v. Inc. Vill. of Patchogue*, 808 F.3d 951, 958 (2d Cir. 2015). As a result of this confusion, when there is probable cause, officers are "entitled to qualified immunity on [an] abuse-of-process claim . . . premised on [an] assertion that [the arresting] Officer lacked probable cause to arrest [the plaintiff]." *DuBois v. Cunningham*, No. 21-923, 2022 WL 2186956, at *3 (2d Cir. June 17, 2022). As Defendants had probable cause to arrest Plaintiff, *see supra* Part IV(A), they are entitled to qualified immunity. Therefore, the Court grants Defendants summary judgment on the malicious abuse of process claim.

### E. Deprivation of Due Process

Plaintiff argues that Defendants failed to protect him and Ms. McCarty, and that this failure to protect is a violation of due process. Pl. Resp. at 21–23. Defendants argue they are entitled to summary judgment as they were under no obligation to protect Plaintiff from private violence. Mot. at 16–17.

Generally, "a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause."*DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 197 (1989). However, "state actors may be liable under section 1983 if they affirmatively created or enhanced the danger of private violence." *Okin v. Vill. of Cornwall-On-Hudson Police Dep't*, 577 F.3d 415, 428 (2d Cir. 2009). "[T]he Due Process Clause may be violated when police officers' *affirmative* conduct—as opposed to *passive* failures to act—creates or increases the risk of private violence, and thereby enhances the danger to the victim." *Id.* at 428 (emphasis in original). Further, "repeated, sustained inaction by government officials, in the face of potential acts of violence, might . . . ris[e] to the level of an affirmative condoning of private violence, even if there is no explicit approval or encouragement." *Id.* Courts have found police officers to have engaged in affirmative conduct when they indicated to assailants that they can assault others without repercussions, *see Dwares v. City of New York*, 985 F.2d 94, 99 (2d Cir. 1993), *overruled on other grounds by Leatherman v. Tarrant Cnty. Narcotics Intel. & Coordination Unit*, 507 U.S. 163, 164 (1993), or when they allow third parties to shoot a suspect, *Hemphill v. Schott*, 141 F.3d 412, 419 (2d Cir. 1998). Conversely, mere failure to intervene is not affirmative conduct. *See DeShaney*, 489 U.S. at 192–93, 196–98 (holding that social workers did not violate the Due Process Clause when they failed to intervene when a father severely abused his young son); *see also Star v. Burlington Police Dep't*, 1999 WL 710235, at *1 (2d Cir.

19

Sept. 2, 1999) (holding that a police department did not violate the Due Process Clause when they failed to respond to the plaintiff's complaints that a private party was going to harm her).

Plaintiff claims that the failure to arrest the Decedent on March 3, 2020, and the police leaving the vicinity of Ms. McCarty's home, "le[ft] McClenos free to return immediately—communicating, in effect, that there would be no immediate consequences." Pl. Resp. at 23. The problem with Plaintiff's argument is that the police were not in a position to arrest the Decedent when they first arrived on the scene, because the Decedent was not present. *See* Dkt. No. 100-36 at 1 ("Domestic Incident Report"). Even assuming *arguendo* that failing to arrest a suspect on its own could constitute affirmative conduct, it cannot be the case that failing to arrest a suspect who is not present communicates approval of the suspect's actions, since the suspect is not there to receive the message.

As Plaintiff is unable to provide examples of "affirmative conduct" or "affirmative condoning" of the Decedent's unlawful actions, Defendants are entitled to summary judgement on Plaintiff's Deprivation of Due Process claim. *See Okin*, 577 F.3d at 428.

### F. *Monell* Liability

In *Monell*, the Supreme Court held "[l]ocal governing bodies . . . can be sued . . . under § 1983 for monetary, declaratory, or injunctive relief where . . . the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 690 (1978). This *Monell* liability "impose[s] civil liability on municipalities for their *own* illegal acts," not the illegal acts of their employees. *Pembaur v. City of Cincinnati*, 475 U.S. 469, 479 (1986) (emphasis in original).

20

To establish a *Monell* claim under § 1983, a plaintiff must plead and prove that the deprivation of his constitutional rights was "caused by a governmental custom, policy, or usage of the municipality." *Jones v. Town of East Haven*, 691 F.3d 72, 80 (2d Cir. 2012) (citing *Monell*, 436 U.S. at 690–91). To successfully bring a *Monell* claim, first, a plaintiff may show the existence of a municipal policy or custom by alleging:

> (1) a formal policy officially endorsed by the municipality; (2) actions or decisions made by municipal officials with decision-making authority; (3) a practice so persistent and widespread that it constitutes a custom of which policymakers must have been aware; or (4) a failure by policymakers to properly train or supervise their subordinates, such that the policymakers exercised "deliberate indifference" to the rights of the plaintiff and others encountering those subordinates.

*McLennan v. City of New York*, 171 F. Supp. 3d 69, 94 (S.D.N.Y. 2016). "Second, the plaintiff must establish a causal connection—an 'affirmative link'—between the policy and the deprivation of his constitutional rights." *Vippolis v. Village of Haverstraw*, 768 F.2d 40, 44 (2d Cir. 1985) (quoting *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 824 n.8 (1985)).

"A fundamental requirement of a *Monell* claim is the establishment of an underlying constitutional violation." *Dees v. Zurlo*, No. 1:24-CV-0001 (MAD/DJS), 2024 WL 1053237, at *14 (N.D.N.Y. Mar. 11, 2024), *report and recommendation adopted*, No. 1:24-CV-1 (MAD/DJS), 2024 WL 2291701 (N.D.N.Y. May 21, 2024), *aff'd sub nom. Dees v. Knox*, No. 24-1574-CV, 2025 WL 485019 (2d Cir. Feb. 13, 2025), *cert. denied*, 146 S. Ct. 201, 223 (2025). The presence of qualified immunity for individual defendants does not defeat a *Monell* claim, as long as there was an underlying constitutional violation. *Dean v. Town of Hempstead*, No. 14-CV-4951 (MKB), 2024 WL 3849688, at *29 (E.D.N.Y. Aug. 16, 2024).

As this Court has only found a constitutional violation with respect to Plaintiff's fair trial *Brady* claim, Defendants are entitled to summary judgment on Plaintiff's *Monell* claims

unrelated to that violation: failure to train regarding domestic violence, failure to train regarding justification, and failure to supervise regarding domestic violence. *See* Pl. Resp. at 24. The Court now turns to Plaintiff's *Monell* claims for which there is an underlying violation: the City's evidence handling policy, failure to train regarding evidence handling, and the City's detective promotion policy.

### 1. Evidence Handling Policy

Plaintiff, argue that failure of the police to give the prosecution the Michel Interview was caused by inadequate policies regarding how the police handle evidence. *See* Pl. Resp. at 28 –31.

A municipality may be liable under *Monell* for failing to ensure that its officers disclose exculpatory evidence to the prosecution. *See Poventud v. City of New York*, No. 07 CIV. 3998 DAB, 2015 WL 1062186, at \*15 (S.D.N.Y. Mar. 9, 2015) *see also Murvin v. Jennings*, 259 F. Supp. 2d 180, 187 (D. Conn. 2003).

Defendant City "typically make[s] working copies [of evidence] that both the detectives and/or the DA's office will work with while the originals remain in evidence." Dkt. No. 102-2 at 141–42 ("Keeler Dep."). There is no policy regarding this practice, nor any training regarding it. *Id.* at 142. Plaintiff suggests that these facts show that the Troy Police Department's "police evidence-handling practices . . . lack reliable procedures and predictably result in material exculpatory or impeachment evidence not being timely transmitted to prosecutors," and that Troy has admitted its policy "governing how critical evidence is transmitted from police to prosecutors lacks evidentiary and constitutional safeguards." Pl. Resp. at 28–29. Plaintiff goes so far as to say, without adequate citation, that it is the "admitted policy of the City of Troy" that it is prosecutor's obligation, rather than the police's, "to discover missing, logged evidence." *See*

22

*id.* at 30–31 (claiming that this must be the case, because the City noted that the prosecution could have asked for the video).

Plaintiff's argument is unavailing. Plaintiff cannot "establish a causal connection . . . between the policy" of using working copies of evidence such as video recordings, and the violation of Plaintiff's constitutional rights. *See Vippolis*, 768 F.2d at 44. Plaintiff has provided no reason to believe that working copies could not be regularly handed to prosecutors. *See* Pl. Resp. at 28–31. It is Plaintiff's burden to demonstrate causation, *see Vippolis*, 768 F.2d at 44, and he has not met this burden. Additionally, Plaintiff misrepresents Defendants' position in claiming that it is Troy's "admitted policy" to put the burden on the prosecution to ask for materials rather than for the police to provide them; Defendants merely note that had the prosecution "should have reached out" to the police to receive the recording. Keeley Dep. at 189. Therefore, Defendants are entitled to summary judgment on this aspect of the *Monell* claim.

*2. Failure to Train on Evidence Handling*

In addition to Plaintiff's argument regarding the City of Troy's policies about evidence handling, Plaintiff argues that the City is also liable because of a failure to train officers regarding handling evidence. Mot. at 29–31.

The Second Circuit has established three requirements for a failure to train *Monell* claim: (1) A reasonable finder of fact must be able to "conclude that a policy-maker knows to a moral certainty that her employees will confront a given situation"; (2) "[T]he situation either presents the employee with a difficult choice of the sort that training or supervision will make less difficult or that there is a history of employees mishandling the situation"; (3) "[T]he wrong choice by the city employee will frequently cause the deprivation of a citizen's constitutional rights." *Green v. City of New York*, 465 F.3d 65, 80–81 (2d Cir. 2006) (cleaned up). To survive

summary judgment, there must be "a specific deficiency in the city's training program and . . . that deficiency [must be] closely related to the ultimate injury, such that it actually caused the constitutional deprivation." *Id.* at 81 (quoting *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 129 (2d Cir. 2004)). Indeed, as the Supreme Court has recognized, "[a] municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick v. Thompson*, 563 U.S. 51, 61 (2011).

Plaintiff claims that "TPD officers received no formal or field training regarding the identification, preservation, or disclosure of exculpatory, or *Brady*, evidence." Pl. Resp. at 29 (emphasis added*); see also* Pl. SMF ¶¶10–12. However, Plaintiff misrepresents Defendant City of Troy's testimony. *See* Def. Resp. to Pl. SMF ¶¶10–12. SMF Keeler, testifying on behalf of the City, stated that officers were trained on *Brady* in the academy. Keeler Dep. at 181. Additionally, "we regularly talk about making sure all the evidence is turned over in a case, making sure the officers turn in all their notes and it is a priority for any case, specifically those that result in arrest." *Id.* The Rensselaer County District Attorney's office provides "legal updates" training for at least twenty-one hours every year, regarding changes in the law, which could relate to the turning over of documents (though it need not). *See id.* at 182. As Plaintiff has presented no argument that the actual training provided by Defendant City is inadequate, Defendants are entitled to summary judgment on the failure to train component of the *Monell* claim.

### 3. Detective Promotion Policy

The City of Troy promotes officers to the rank of detective through seniority, rather than merit. *See* Pl. SMF ¶¶ 141–42. Detectives receive no additional training upon becoming a detective. *Id.* at 143. Plaintiff concludes from this that the City was "deliberately indifferent to the obvious risk that detectives will have not been provided the training to develop the skills

necessary to be good at their jobs." Pl. Resp. at 32. This is not the case, because Plaintiff has failed to establish causation. Detectives were provided training on *Brady* in the police academy. Keeler Dep. at 181. Plaintiff has not established that officers who have been promoted to detective, who are in good standing and have received academy training, would be unable to fulfill the *Brady* obligations for which they have been trained. Therefore, Defendants are entitled to summary judgement on the *Monell* claims stemming from the promotion policy.

## V.      CONCLUSION

Accordingly, it is hereby:

**ORDERED**, that Defendants' Motion for Summary Judgment, Dkt. No. 100, is **GRANTED**; and it is further

**ORDERED** that Plaintiff's Cross-Motion for Summary Judgment, Dkt. No. 101, is **DENIED** as moot; and it is further

**ORDERED**, that Plaintiff's Cross-Motion for Summary Judgment, Dkt. No. 102, is **DENIED**; and it is further

**ORDERED**, that Plaintiff's Amended Complaint, Dkt. No. 57, is **DISMISSED without prejudice**; and it is further

**ORDERED**, that the Clerk is respectfully directed to close this action; and it is further

**ORDERED**, that the Clerk serve a copy of this Memorandum-Decision and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

DATED:      June 29, 2026
            Albany, New York

LAWRENCE E. KAHN
United States District Judge

25